UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, OUR
CHILDREN'S EARTH FOUNDATION, and
ECOLOGICAL RIGHTS FOUNDATION,

        Plaintiffs,

        v.

CITY OF GULFPORT,

        Defendant.

Civil Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

        Suncoast Waterkeeper ("SCWK"), Our Children's Earth Foundation ("OCE") and Ecological Rights Foundation ("EcoRights") (collectively, "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

        1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, *et seq*. ("Clean Water Act" or "CWA") (*see* 33 U.S.C. § 1365). This Court has subject matter jurisdiction over the parties and this action pursuant to section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

        2.      On October 28, 2016, Plaintiffs issued a sixty (60) day notice letter ("Notice Letter") to the City of Gulfport ("Gulfport"). The Notice Letter informed Gulfport of its violations of the Clean Water Act and of Plaintiffs' intention to file suit against Gulfport. The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IV, and the Secretary of the Florida Department of Environmental

Protection ("DEP") as required by section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter was also sent to the Executive Director of the Southwest Florida Water Management District ("Regional District").

3.      More than sixty (60) days have passed since the Notice Letter was issued to Gulfport and the state and federal agencies.

4.      Plaintiffs are informed and believe, and thereon allege, that neither EPA nor the state of Florida has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint under section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

5.      Venue is proper in the Middle District of Florida, Tampa Division, pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district, specifically Pinellas County.

## II.      INTRODUCTION

6.      Plaintiffs allege the following violations of the Clean Water Act: (1) discharges of pollutants to waters of the United States without National Pollution Discharge Elimination System ("NPDES") Permit authorization in violation of section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a); and (2) violations of the *State of Florida Municipal Separate Storm Sewer System Permit,* NPDES Permit No. FLS000005-003 ("MS4 Permit"). Gulfport's violations of the Clean Water Act and their NPDES permit are ongoing and continuous.

## III.      PARTIES AND BACKGROUND

### A.      Plaintiffs

7.       SCWK is a non-profit public benefit corporation with members throughout the Tampa Bay area, dedicated to protecting and restoring the Florida Suncoast's waterways through enforcement, fieldwork, advocacy, and environmental education for the benefit of the communities and SCWK's members that rely upon these precious coastal resources. SCWK aims to protect local waterways for use for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation. Pinellas County waterways and communities are included in SCWK's area of

operation. SCWK has been registered as a non-profit corporation in Florida since 2012 and has maintained its good and current standing in Florida since that time. SCWK is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 300 separate Waterkeeper programs, such as SCWK. SCWK's office is located in Sarasota, Florida. SCWK represents its members in and around St. Petersburg, Gulfport, and Pinellas County who have personally suffered harm to their aesthetic, recreational, and employment-related interests due to Gulfport's sanitary sewer overflows ("SSOs") (*i.e.*, the discharge of raw or inadequately treated sewage) into Tampa Bay, the Gulf of Mexico, and other water bodies, streams, or tributaries in or adjoining Gulfport. SCWK members enjoy sailing, swimming, kayaking, paddleboarding, surfing, kiteboarding, snorkeling, diving, fishing, boating, wading, walking and cycling along the shoreline, and observing wildlife. SCWK members include commercial and charter fishermen who depend upon the ecological health of the Suncoast's waterways for their livelihood, and a commercial diver who dives in the areas affected by the sewage discharges. SCWK members conduct nature surveys and studies and photograph wildlife in and around the affected waterways. SCWK members contact the affected waters directly when they do maintenance work on boats, participate in body-contact water sports, or participate in organized trash cleanups along the shoreline.

8.     OCE is a non-profit public benefit corporation with members throughout the United States, including Florida and specifically the Tampa Bay area, dedicated to protecting its members and the public, especially children, from the health impacts of pollution and other environmental hazards and to improving environmental quality, including the quality of surface waters, for the public benefit and benefit of its members, including the use of surface waters for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation. Another aspect of OCE's mission is to participate in environmental decision making, enforce environmental laws (including via citizen suits), both federal and state, to reduce pollution, and to educate the public concerning those laws and their enforcement.

9.     EcoRights is a non-profit public benefit corporation with members across the United States, including Florida and specifically the Tampa Bay area. Among other work it does, EcoRights focuses on protecting surface waters from pollution and degradation for the public benefit and benefit of

its members, to preserve and improve its members' and the public's use of surface waters for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation. EcoRights represents citizens who are striving to protect waterways from pollution and secure the multitude of public and private benefits that follow from clean, vibrant waters: safe drinking water, abundant and diverse wildlife populations, healthy recreational activities, and economic prosperity from commercial, sport, and subsistence fishing; and other commercial activities that depend on clean water. To further its environmental advocacy goals, EcoRights actively seeks federal and state agency implementation of state and federal water quality related laws, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

10.     SCWK, OCE and EcoRights' members use and enjoy the ocean and bay waters and other waters adjoining and in Gulfport for body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.

11.     Gulfport's illegal discharges of raw and/or partially treated sewage to ocean and bay waters and other waters adjoining and in Gulfport degrade water quality and harm aquatic life in these waters, and thus impairs Plaintiffs' members' use and enjoyment of the ocean and bay waters and other waters adjoining and in Gulfport.

12.     The interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Gulfport's failure to comply with the MS4 Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiffs' members caused by Gulfport's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs' members, for which harm they have no plain, speedy, or adequate remedy at law.

13.     SCWK, OCE and ERF bring this action on behalf of their members to address and remedy the injuries in fact suffered by these members as a result of Gulfport's SSOs as described above. The interests of Plaintiffs' members at stake are germane to the purposes for which SCWK, OCE and ERF have been created. SCWK, OCE and ERF's organizational purposes all include protecting surface waters from pollution and degradation to promote their members' and the public's abilities to use surface waters for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation.

**B.     The City of Gulfport**

14.     Gulfport is a municipality incorporated under the laws of the state of Florida and a person within the meaning of Section 403.031(5), Fla. Stat.

**1.  The Sewage Collection and Treatment System**

15.     Approximately 80% of Gulfport is served by Gulfport's own wastewater collection system (WCS).

16.     The Gulfport WCS consists of pipes and other manmade conveyances, and constitutes a point source under the Clean Water Act. *See* 33 U.S.C. § 1362(14).

17.     The City of St. Petersburg owns and operates wastewater reclamation facilities ("WRFs") and appurtenant sewage wastewater collection and transmission systems ("St. Petersburg WCTS") which collectively constitute a publicly owned treatment works ("POTW") as defined in CWA section 212(2) and 40 C.F.R. section 125.58(s).

18.     All wastewater collected within Gulfport is ultimately transported to the St. Petersburg POTW. The POTW includes the following WRFs and associated St. Petersburg WCTS serving the City of St. Petersburg and other portions of Pinellas County.

Albert Whitted Water Reclamation Facility, 601 8th Ave. S.E.

Northeast Water Reclamation Facility, 1160 62nd Ave. N.E.

Northwest Water Reclamation Facility, 7500 26th Ave. N.

Southwest Water Reclamation Facility, 3800 54th Ave. S.

St. Petersburg Master Reuse System, 1650 Third Ave. N.

19.     The WRFs are individually permitted under the State of Florida Domestic Wastewater Facility Permit Program ("State Permits").[1]

20.     All wastewater collected in Gulfport is ultimately discharged to St. Petersburg's WRFs for treatment.

21.     The WRFs and all wastewater collection facilities, including those owned and operated

---

[1] Albert Whitted Water Reclamation Facility, Wastewater Permit No. FLA128830; Northwest Water Reclamation Facility, Wastewater Permit No. FLA128821; Northeast Water Reclamation Facility, Wastewater Permit No. FLA 128856; Southwest Water Reclamation Facility, Wastewater Permit No. FLA128848.

by Gulfport, which convey wastewater to the WRFs, are publicly owned treatment works as defined in CWA section 212(2) and 40 C.F.R. section 125.58(s).

22.     Since October 28, 2011, Gulfport has repeatedly spilled raw and partially treated sewage from its WCS. Such SSOs have repeatedly spilled from Gulfport sewer lines, manholes, pump stations, and various other equipment/conveyances that are part of the WCS.

23.     These SSOs include all SSOs (1) noted in the exhibit (Exhibit B) accompanying Resolution No. 2016-55 adopted by the Gulfport City Council on August 2, 2016; (2) listed in section 2.2.1 in a report from Gulfport's contractor Cardino dated February 2016, "Sanitary Sewer Evaluation Survey Final Report" (including various large wet weather-related SSOs in 2013, 2014, and 2015); and (3) publicly reported by St. Petersburg and/or Gulfport to the Florida Department of Environmental Protection and to the press (such as the large SSOs in June, August, and September 2016 from both Gulfport and St. Petersburg's collection systems and/or POTW). A partial list of Gulfport's SSOs was attached as Exhibit 1 to the citizen suit notice letter sent by Plaintiffs. Additionally, infiltration and inflow into Gulfport's WCS has caused or contributed to the lack of capacity in the entire POTW system, resulting in SSOs throughout the system including the SSOs listed in Table 1 set forth at the end of this Complaint.

24.     Each of these SSOs that has caused pollutants to flow into waters of the United States constitutes a separate violation of CWA section 301(a).

25.     Gulfport is responsible for operating and maintaining the WCS, tasks which include, but are not limited to: collecting and conveying sewage through the WCS, conducting routine maintenance, cleaning, and inspection of the WCS; and responding to citizens' complaints regarding discharges of raw and/or partially treated sewage.

26.     Gulfport is responsible for operating and maintaining the Gulfport MS4, tasks which include, but are not limited to, preventing the discharge of non-stormwater (*i.e.*, any substances other than storm water including but not limited to sewage) into the Gulfport MS4.

**B.     The Local Waterways that Receive Gulfport's Illegal Discharges and the Injuries to Plaintiffs' Members and the Public from those Discharges**

27.     The Gulfport WCS is located in watersheds that drain to Tampa Bay, the Gulf of Mexico,

and other water bodies, streams, or tributaries in or adjoining Gulfport. The storm pipes in the Gulfport MS4 also discharge to these waters.

28.     SSOs from the WCS as well as SSOs that enter the Gulfport MS4 from the WCS, or from privately-owned lateral lines, are discharged to Tampa Bay, the Gulf of Mexico, and other water bodies, streams, or tributaries in or adjoining Gulfport.

29.     Tampa Bay, the Gulf of Mexico, and other water bodies, streams, or tributaries in or adjoining Gulfport are waters of the United States, and/or have a significant nexus to waters of the United States and thus are navigable waters as defined by the Clean Water Act and controlling authority.

30.     Tampa Bay is an ecologically sensitive water body and a defining feature of Southwest Florida. Tampa Bay is an important and heavily used resource, with special aesthetic and recreational significance for people living in the surrounding communities. The Tampa Bay shoreline has numerous highly valued beaches and points of public access that offer unique recreational opportunities for swimmers, kayakers, windsurfers, sport fishers and other recreational users. Included amongst these resources are specially recognized and protected waterways such as the Terra Ceia Aquatic Preserve, Boca Ciega Bay Aquatic Preserve, and the Pinellas County Aquatic Preserve, all of which are designated Outstanding Florida Waters, pursuant to 62-302.400 F.A.C., as worthy of special water quality protections because of their natural attributes.

31.     SSOs harm Tampa Bay, the Gulf of Mexico, and other water bodies, streams, or tributaries in or adjoining Gulfport and pose a serious risk to fisheries, wildlife habitat, and human health. SSOs contain human waste, viruses, protozoa, mold spores and bacteria that are known pathogens that cause disease in humans and wildlife. The human waste in SSOs further contain nutrients that increase the risk of algae blooms known as "red tides" that are toxic to fish and cause skin and respiratory irritation in sensitive members of the human population. The fish kills associated with red tides cause eyesores and noxious odor conditions associated with dead and decaying fish, making waters unfit for recreational use, aesthetic enjoyment, or spiritual contemplation. Red tides have caused well documented fish kills in Tampa Bay and nearby ocean waters. Nutrient loading due to SSOs caused or contributed to by Gulfport has likely increased the length and severity of red tides in Tampa Bay and surrounding ocean waters—and the severity of the fish kills and conditions noxious to human use of

these waters associated with the red tides. In addition, SSOs contain chemicals that cause cancer or reproductive toxicity in humans and wildlife. These chemicals come from solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals, and other chemicals used by households and businesses and then discarded to sewage collection systems.

32.    SSOs from the WCS that discharge to Tampa Bay, the Gulf of Mexico, and other waters in or adjoining Gulfport, as well as SSOs that enter the Gulfport MS4 and subsequently flow directly or with storm water to Tampa Bay, the Gulf of Mexico and other waters in or adjoining Gulfport, result in the addition of the pollutants described above (*i.e.*, pathogens, nutrients, and various toxic chemicals) to these waters.

33.    The intensive use of Tampa Bay and the Gulf of Mexico for commercial and sport fishing, shellfish harvesting, and water-contact recreation increases the likelihood that people will come into direct contact with SSOs and the pollutants they contain. SSOs also affect people who eat fish caught in these waters. Toxic chemicals bio-accumulate in the affected waters' food webs; *i.e.*, contaminants absorbed by plankton accumulate in fish and birds farther up the food chain, and ultimately transfer in higher doses to human consumers.

34.    Portions of Tampa Bay and many of its estuaries, channels, and tributaries, which receive Gulfport's SSOs, are listed on the State of Florida's 2016 Clean Water Act Section 303(d) list of impaired water bodies. A water body that is listed as impaired cannot support its designated beneficial uses. The beneficial uses of the waters that receive Gulfport's SSOs include habitat support for commercial fishing and sport fishing, estuarine habitat, wildlife habitat, fish migration, fish spawning, preservation of rare and endangered species, shellfish propagation and harvesting, contact and non-contact water recreation, industrial service and agricultural water supply, and navigation. DEP Water Quality Standards 62-302 (2010). Lower and Lower North Tampa Bay are listed as impaired for bacteria (in shellfish). Clam Bayou is listed as impaired for dissolved oxygen, fecal coliform, mercury, and excess nutrients (Chlorophyll-a). Boca Ciega Bay is listed as impaired for fecal coliform and mercury. Booker Creek is listed as impaired for fecal coliform. Several of the tributaries to these bays are also listed as impaired due to excessive levels of various pollutants. Some or all of these pollutants are in Gulfport's SSOs.

35.     By discharging SSOs and their associated pollutants directly to Tampa Bay, the Gulf of Mexico, and/or its tributaries in violation of the Clean Water Act, as well as discharging SSOs to the Gulfport MS4 which subsequently flow untreated to Tampa Bay, the Gulf of Mexico, and/or its tributaries, Gulfport contributes to the continuing impairment of these waters. As such, Gulfport's violations of the Clean Water Act directly harm Plaintiffs' members' use and enjoyment of the Tampa Bay and surrounding ocean environment by: (1) loading these waters with pathogens and thus leading these members to have well-founded fears that engaging in water contact recreation in these waters has risked or would risk making them or their family members ill, (2) loading these waters with nutrients that have likely exacerbated red tides and fish kills and conditions noxious to these members' use and enjoyment of these waters and/or that have led these members to have well-founded fears of the worsening of red tide conditions in these waters, (3) loading these waters with various toxic chemicals leading these members to have well-founded fears that they would be harmed if they engaged in water contact recreation or fishing in these waters, and (4) loading these waters with various toxic chemicals leading these members to have well-founded fears that wildlife they enjoy viewing is at risk of harm due to contamination of these waters.

36.     By failing to prevent infiltration and inflow from Gulfport's defective WCS from flooding St. Petersburg's POTW and overloading the system during wet weather events, Gulfport causes or contributes to SSOs throughout the POTW which discharge directly to Tampa Bay, the Gulf of Mexico, and/or its tributaries in violation of the Clean Water Act, contributing to the continuing impairment of these waters. As such, Gulfport's violations of the Clean Water Act directly harm Plaintiffs' members' use and enjoyment of the Tampa Bay and surrounding ocean environment by: (1) loading these waters with pathogens and thus leading these members to have well-founded fears that engaging in water contact recreation in these waters has risked or would risk making them or their family members ill, (2) loading these waters with nutrients that have likely exacerbated red tides and fish kills and conditions noxious to these members' use and enjoyment of these waters and/or that have led these members to have well-founded fears of the worsening of red tide conditions in these waters, (3) loading these waters with various toxic chemicals leading these members to have well-founded fears that they would be harmed if they engaged in water contact recreation or fishing in these waters, and (4)

loading these waters with various toxic chemicals leading these members to have well-founded fears that wildlife they enjoy viewing is at risk of harm due to contamination of these waters.

37.     The SCWK members who have suffered injuries in fact caused by SSOs caused or contributed to by Gulfport include, by way of illustrative example, Mike Sullivan, Joseph McClash, Sean McClash, John Rice, Rob Alfieri, Jill Wenner, Sandra Ripberger, and Andrew Hayslip. Additionally, by way of illustrative example, Rachel Rosner is one EcoRights' member who has suffered injuries in fact caused by SSOs caused or contributed to by Gulfport.

38.     Mike Sullivan, current SCWK member who has been a member since before this action was filed, lives in St. Petersburg. He enjoys swimming in Tampa Bay and the Atlantic Ocean and frequently takes walks along St. Petersburg's bayfront and parks. Gulfport's SSOs (and SSOs from the St. Petersburg POTW system which were caused or contributed to by Gulfport) have caused Mr. Sullivan to lessen the frequency of these activities and diminished his enjoyment of them because of the foul odors and his fears about the safety of swimming in waters contaminated by raw sewage. He recently participated in a waterway cleanup event on the Route 275 causeway in St. Petersburg that was adversely affected by concerns about water quality related to sewage spills.

39.     Joseph McClash, current SCWK member who has been a member since before this action was filed, lives in Bradenton, Florida. He is an avid sailor who sails in and around St. Petersburg and Gulfport, and enjoys fishing from the deck of his son's house in St. Petersburg. Mr. McClash believes that the SSOs that are the subject of this litigation have degraded the waterways in and around St. Petersburg and Gulfport and caused him to lessen the frequency and enjoyment of his sailing and fishing activities in these waters.

40.     Sean McClash, current SCWK member who has been a member since before this action was filed, lives on the waterfront in St. Petersburg, Florida. He lives on a canal and enjoys fishing, but recently had to stop fishing completely for an entire month due to the foul odors caused by the SSOs that are the subject of this litigation. Mr. McClash also owns a yacht management company and is concerned for the safety of his employees, including a diver whom he has observed "literally swimming in raw sewage."

41.     John Rice, current SCWK member who has been a member since before this action was

filed, lives in Temple Terrace, Florida. He regularly fishes from a kayak in Simmons Park and Cockroach Bay. On Monday, September 26, 2016, following the massive sewage discharges from St. Petersburg's sewage wastewater collection and transmission system, he observed a smell "like a urinal" and a "film of brown foam" in the shallow waters of Cockroach Bay. Due to the high water level of the bay and river during the St. Petersburg SSOs in November, Mr. Rice believes that the foul smell in Cockroach Bay is likely due to sewage from St. Petersburg's SSOs (which were also contributed to by excessive sewage flows from Gulfport into St. Petersburg's sewage wastewater collection and transmission system) accumulating six inches to a foot above the regular water level in the Cockroach Bay mangroves, which usually do not experience much tidal fluctuation. Mr. Rice and his wife fish or engage in other recreational activities in and around Cockroach Bay from 20 to 25 times per year, and the SSOs from St. Petersburg (including those caused or contributed to by Gulfport) have caused them to lessen the frequency and enjoyment of their fishing and recreation.

42. Rob Alfieri, current SCWK member who has been a member since before this action was filed, lives in Sarasota, Florida. Mr. Alfieri is an avid kiteboarder who frequents the beaches and waterways of Pinellas County, most often to the north of the Sunshine Skyway bridge along Route 275. He believes that SSOs from Gulfport's wastewater collection system which are the subject of the claims alleged herein have degraded the waters in which he kiteboards, reducing the frequency and enjoyment of his kiteboarding and causing him ongoing concern about the future safety and enjoyment of kiteboarding in Pinellas County and the surrounding waterways.

43. Jill Wenner, current SCWK member who has been a member since before this action was filed, lives in St. Petersburg and spends a significant amount of time in Gulfport. Ms. Wenner has repeatedly noticed strong sewage odors around Gulfport beaches and piers after significant rainfall events, which has considerably lessened her enjoyment of Gulfport's beachfront environment. Ms. Wenner and her husband also frequently kayak in Pinellas County, primarily in the Fort DeSoto Park area. However, the frequency and enjoyment of their kayak trips has been reduced as a result of the sewage spills and their concerns about the safety and quality of the water.

44. Sandra Ripberger, current SCWK member who has been a member since before this action was filed, is a Manatee County resident who sails from the St. Pete Sailing Center every

Wednesday. She sailed several times in September and believes that the sewage spills that are the subject of our litigation degrade the waterways and have lessened the frequency and enjoyment of her sailing activities.

45.     Andrew Hayslip, current SCWK member who has been a member since before this action was filed, lives on the waterfront in St. Petersburg. He frequently kayaks and boats around St. Petersburg and Gulfport. He believes that the sewage spills that are the subject of our litigation degrade the waterways and have lessened the frequency and enjoyment of his kayaking and boating activities, as well as negatively affecting his quality of life as a resident of the St. Petersburg waterfront.

46.     Rachel Rosner, current EcoRights member who has been a member since before this action was filed, lives near the waterfront in Sarasota, Florida. She has long been an environmental activist stemming from her strong personal beliefs in the need to protect the environment for the benefit of her family, friends, the public at large, for wildlife, and for herself. She and her son regularly visit the beach in Sarasota located a short distance from her house and other Sarasota beaches. She and her son also occasionally visit the beaches in Treasure Island and St. Pete Beach, as well as other parts of the Sarasota County and Pinellas County shorelines. She and her son intend to continue going to these beaches in the future. Both Ms. Rosner and her son enjoy wading and swimming at these beaches, observing shorebirds and marine life, including sea turtles and manatees; enjoying the view of ocean waters, and the smell of clean saltwater air. She observed the severe red tide conditions created in the ocean waters adjacent to Sarasota in September and October 2016 in person when she visited beaches in Sarasota. She observed first hand dead fish washed up on the beach and floating in the nearshore waters. She also viewed local news reports of similar red tide conditions in St. Pete Beach and Treasure Island that also caused fish kills, such as the Tampa Bay Times news story published on the Internet at http://www.tampabay.com/news/environment/water/its-official-red-tide-arrives-off-pinellas-county/2295574. These red tide conditions substantially impaired her enjoyment of Sarasota beaches. The dead fish were disturbing to look at and she was upset to view the loss of marine life caused by the red tide conditions. Additionally, the dead fish created a strong stench that made it unpleasant to be by the oceanside. She avoided going to St. Pete Beach or Treasure Island knowing that there were red tide conditions there as well. She has a well-founded fear that these red tide conditions were exacerbated by

the series of very large SSOs from St. Petersburg in June, August, and September 2016 (which were caused both by problems in St. Petersburg's sewage collection system and in Gulfport's sewage collection system as well which sends it sewage to St. Petersburg and has old, leaky sewage pipes. These problems with Gulfport's sewage collection system cause Gulfport's flows of sewage to St. Petersburg to spike in a big way during rain storms. This overwhelms St. Petersburg's system leading to SSOs). She is aware that sewage has nutrients that are well-known to be capable of promoting algae blooms that are the cause of red tides. She is further aware that prevailing ocean currents flow from the St. Petersburg area south towards Sarasota and thus risk transporting nutrients from SSOs toward Sarasota. Indeed, she is aware that news accounts have quoted reputable scientists, such as Kelly Redmond of Florida's Fish and Wildlife Research Institute (which monitors toxic algae blooms) as indicating that SSOs have risked making these red tides worse. She is apprehensive that future SSOs from St. Petersburg and Gulfport will continue to add nutrients to local waters and increase the risk of red tides in the future unless comprehensive steps are taken to improve the sewage collection systems of St. Petersburg and Gulfport. She is also aware that SSOs have caused damage to seagrasses in Tampa Bay. She is aware that these Tampa Bay seagrasses provide important habitat for vital marine ecosystems, providing food, habitat and nursery areas for numerous species, shellfish, manatees and sea turtles. She is concerned that damage to these seagrasses has harmed and will in the future harm the manatees, sea turtles and other marine life in the area and make it less likely that she will view healthy and abundant marine life on Sarasota beaches, St. Pete Beach, Treasure Island, and other parts of the Sarasota County and Pinellas County shorelines. She is also concerned that her home, due to her home's close proximity to the Sarasota Bay, has already been adversely affected by SSOs from St. Petersburg and Gulfport and will be adversely affected in the future if sewage spills from St. Petersburg and Gulfport are not curtailed.

## IV.    STATUTORY AND LEGAL REQUIREMENTS

### A.    The Clean Water Act

47.    Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the Clean Water Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to section 402 of the Clean Water

Act, 33 U.S.C. § 1342.

48.     Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), requires an NPDES Permit for municipal storm water discharges.

49.     The Gulfport MS4 Permit is an NPDES Permit issued by DEP pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342. *See* Gulfport MS4 Permit.

50.     Any violation of the Gulfport MS4 Permit is a violation of the Clean Water Act. *See* 40 C.F.R. § 122.41(a) (2001).

51.     Section 505(a) of the Clean Water Act provides for citizen enforcement actions against any "person," for violations of (1) any effluent standard or limitation or (2) an order issued by the Administrator or a State with respect to such a standard or limitation. *See* 33 U.S.C. §§ 1365(a), 1365(f), 1362(5).

52.     Gulfport is a "person" within the meaning of Clean Water Act section 502(5), 33 U.S.C. § 1362(5).

53.     Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), authorizes an action for injunctive relief.

54.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day per violation for violations occurring from January 12, 2009, to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).

55.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' and experts' fees.

**C.     The Requirements of the Gulfport MS4 Permit**

56.     The Gulfport MS4 Permit was most recently issued in 2013.

57.     The Gulfport MS4 Permit contains prohibitions and limitations on the discharge of pollutants into Gulfport's MS4.

58.     The Gulfport MS4 Permit requires that Gulfport effectively prohibit discharges of non-storm water into its MS4. MS4 Permit, Limitations on Coverage, § I.D.

V.     **CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Gulfport's Discharges of SSOs to Waters of the United States Without NPDES Permit**
**Coverage in Violation of the Clean Water Act**

59.     Since October 28, 2011, Gulfport has repeatedly spilled raw and partially treated sewage from its WCS that carries sewage to the POTW. Such SSOs have repeatedly overflowed or spilled from Gulfport sewer lines, manholes, pump stations, and various other equipment/conveyances. In addition, infiltration and inflow of stormwater, groundwater, and seawater into Gulfport's sewer lines due to inadequate operations, maintenance, monitoring, and repairs increases the total volume of wastewater transmitted to the St. Petersburg WCTS and WRFs, contributing to excessive levels of wastewater flow beyond the flow capacity of the St. Petersburg WCTS and WRFs. This excessive loading of wastewater flow caused in part by Gulfport's defective WCS has in turn caused or contributed to numerous SSOs from the St. Petersburg WCTS and WRFs.

60.     SSOs from the WCS have reached and directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around the affected waters.

61.     SSOs from the St. Petersburg WCTS and WRFs that are caused in part by excess system loading due to infiltration and inflow of stormwater, groundwater, and seawater from Gulfport's defective WCS have reached and directly contaminated waters that Plaintiffs' members use for body-contact water sports, fishing, boating, and other activities, causing Plaintiffs' members to lessen the frequency and enjoyment of their activities in and around the affected waters.

62.     The SSOs caused or contributed to by Gulfport which constitute Clean Water Act violation by Gulfport include all SSOs (1) noted in the exhibit (Exhibit B) accompanying Resolution No. 2016-55 adopted by the Gulfport City Council on August 2, 2016; (2) listed in section 2.2.1 in a report from Gulfport's contractor Cardino dated February 2016, "Sanitary Sewer Evaluation Survey Final Report" (including various large wet weather-related SSOs in 2013, 2014, and 2015); and (3) publicly reported by St. Petersburg and/or Gulfport to the Florida Department of Environmental Protection and to the press (such as the large SSOs in June, August, and September 2016 from both Gulfport and St.

Petersburg's wastewater collection systems and/or POTW). A partial list of SSOs caused by or contributed to by Gulfport are listed in Table 1 set forth at the end of this Complaint.

63.    Gulfport has discharged and continues to discharge SSOs from the WCS to waters of the United States, and/or into its MS4 that then discharges to waters of the United States, without NPDES permit coverage, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and the Gulfport MS4 Permit.

64.    Of the SSOs from the WCS since October 28, 2011, many have discharged to surface waters and/or into the municipal separate storm sewer systems ("MS4") operated by Gulfport.

65.    SSOs from the WCS, as well as SSOs that enter Gulfport's MS4 from the WCS and/or from privately-owned lateral lines, are discharged to Tampa Bay, the Gulf of Mexico, and other waters of the United States in or adjoining Gulfport, and/or to the Gulfport MS4 that then discharges to waters of the United States.

66.    Gulfport's SSOs contain raw and partially treated sewage.  Raw and partially treated sewage contains human waste, viruses, protozoa, mold spores, and bacteria, along with a variety of human bacteriological, viral, and parasitic pathogens, and exposure to raw and partially treated sewage is well-known to cause various illnesses in humans and animals.

67.    Raw and partially treated sewage from Gulfport's SSOs contaminates water that is used by Plaintiffs' members and others for body contact recreational water sports, exposing them to an increased risk of illness or other harms associated with contact with raw and partially treated sewage.

68.    Gulfport's SSOs contain chemicals that cause cancer or reproductive toxicity. These chemicals come from solvents, detergents, cleansers, inks, pesticides, paints, pharmaceuticals, and other chemicals used by households and businesses and then discarded to sewage collection systems.

69.    Toxic chemicals from Gulfport's SSOs bio-accumulate in the food chain of the affected waters and contaminate fish and seafood which is consumed by humans, including Plaintiffs' members, exposing them to an increased risk of cancer and/or reproductive toxicity.

70.     Toxic chemicals from Gulfport's SSOs contaminate areas used for swimming, sailing, kayaking, paddleboarding, surfing, snorkeling, and diving, and expose Plaintiffs' members and others who participate in body-contact water sports in the affected waters to an increased risk of cancer and/or

reproductive toxicity.

71.     The nutrients in Gulfport's SSOs increase the risk of algae blooms known as "red tides" that are toxic to fish and that have caused well documented fish kills in Tampa Bay. Such nutrient loading likely increases the length and severity of red tides in Tampa Bay, as well as the likely occurrence of red tides. The fish kills associated with red tides cause eyesores and noxious odor conditions associated with dead and decaying fish, making waters unfit for recreational use, aesthetic enjoyment, or spiritual contemplation. Red tides further cause skin and respiratory irritation in sensitive members of the human population. The occurrence of red tides diminish the enjoyment of Plaintiffs' members of Tampa Bay waters and the apprehension that SSOs are risking causing additional red tides is a further source of injury to Plaintiffs' members.

72.     Gulfport has taken inadequate steps to eliminate its violations of the Clean Water Act. Specifically, Gulfport has failed to adequately operate, maintain, repair, replace, and/or update the WCS, thus resulting in SSOs.

73.     On information and belief, Plaintiffs allege that many of the SSOs from the WCS are the result of unaddressed defects in sewer lines such as extensive line cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment failures, and undersized sewer lines or pump station pumping and/or storage capacity.

74.     On information and belief, Plaintiffs allege that many of the SSOs from the WCS are dry weather SSOs caused by fats, oil and grease in sewer lines, and blockages caused by roots and debris.

75.     A major source of Gulfport's SSOs is wet weather SSOs caused by the WCS's inadequate capacity to handle peak wet weather flows. Flows through the WCS increase considerably during wet weather due to the infiltration and inflow of storm water and groundwater into sewer pipes, thus overwhelming the capacity of the WCS causing SSOs.

76.     SSOs from the WCS are also caused by the deterioration of sewage infrastructure, under-funding of repairs, and mismanagement.

77.     Gulfport's WCS are deteriorating, and deferral of analysis, monitoring, and repairs allows the continued discharge of SSOs to waters of the United States in violation of the Clean Water Act.

78.     According to Gulfport's own engineering analysis, much of Gulfport's WCS is nearing

the end of its useful life.  Predictably for a system of this age, inspections show many defects and structural deficiencies in Gulfport's WCS that result in excessive infiltration and inflow of stormwater and groundwater during wet weather. This excessive infiltration and inflow has caused and will continue to cause repeated wet weather SSOs both in Gulfport and downstream in the St. Petersburg WCTS and WRFs. Additionally, the portion of Gulfport's WCS that has been inspected via CCTV shows many instances of imminent sewer line collapse and other system failures.

79.   Over half of Gulfport's WCS has yet to be inspected. Accordingly, the condition of these lines is unknown. However, given the age of the system and what inspections of the Gulfport WCS have shown to date, it is more than likely that additional SSO-causing defects will be found.

80.   Gulfport plans to inspect its WCS eventually, but has not committed to a timetable for the completion of the planned inspection and evaluation of the remainder of the system. Additionally, Gulfport has not committed to a timetable to complete the necessary repairs.

81.   Gulfport's WCS consists of 224,000 feet (42.5 miles) of sewer pipe along with 200,000 feet of Gulfport-owned "laterals." However, only 84,050 feet of pipe had been inspected as of July 2016, and Gulfport has so far repaired only 30 of the most severe "Priority One" structural defects identified in the partial inspection. Undoubtedly, the portion of Gulfport's WCS that has not been inspected contains similar instances of imminent sewer line collapse and other failures. While it is unknown how many total defects exist, Gulfport spent $380,000 to repair the first 30 Priority One defects, and has allocated another $2,480,000 to fix only those defects that have already been identified, along with another $2,000,000 to fix "additional" Priority One defects over the next 7 years.

82.   Gulfport initially examined the possibility of replacing the entire WCS, but ultimately decided that repairing or replacing only Priority One defects was the most cost-effective option. However, because less than half of Gulfport's sewer pipe has been inspected, and the cost of repairing the identified defects is higher than the amount allocated for fixing unidentified defects in the next 7 years, Gulfport's estimation of the cost of repairing as-yet-unidentified Priority One defects in the uninspected portions of the system is most likely too low to cover the actual costs of the repairs. An additional $4,000,000 has been allocated to the "balance" of Priority One repairs, but under Gulfport's plan these urgent defects will not be addressed for at least 8 and up to 25 years in the future.

83.     Additionally, Gulfport has identified several "Priority Two" defects which require repair. However, there are no plans to address these defects for many years, in which time the defects will almost certainly become more severe and lead to yet more SSOs and discharges to waters of the United States.

84.     Gulfport's discharges of SSOs to waters of the United States, and/or that enter its MS4 that then discharges to waters of the United States, are ongoing and continuous.

85.      Each day that a given SSO from the WCS discharges to waters of the United States, and/or that enters Gulfport's MS4 that then discharges to waters of the United States, is a separate and distinct violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

86.     Gulfport's violations will continue each occasion it discharges SSOs in violation of the requirements of the Clean Water Act.

87.     Significantly more SSOs than those reported by Gulfport will likely be discovered through this enforcement action. Each such additional SSO that discharges to waters of the United States is a separate Clean Water Act violation.

88.     By committing the acts and omissions alleged above, Gulfport is subject to an assessment of civil penalties pursuant to Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least October 28, 2011, to the present.

89.     An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

90.     An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law. WHEREFORE, Plaintiffs pray for relief as set forth herein.

## SECOND CAUSE OF ACTION
### Discharges into the Gulfport MS4 in Violation of the Gulfport MS4 Permit and the Clean Water Act

91.     DEP has issued MS4 Permit Number FLS000005-03 to Gulfport. Gulfport owns and operates the Gulfport MS4. *See* Gulfport MS4 Permit § I.A.

92.     Gulfport has discharged and continues to discharge SSOs from the WCS into its MS4 that

1   then discharges to waters of the United States without NPDES permit coverage, in violation of section

2   301(a) of the Clean Water Act, 33 U.S.C. § 1311(a) and § I.D. of the Gulfport MS4 Permit.

3        93.    An MS4 is defined as "a conveyance or system of conveyances (including roads with

4   drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm

5   drains)" owned or operated by a state, city, or town that is designed or used for collecting or conveying

6   storm water and that discharges to waters of the United States. *See* 40 C.F.R. §§ 122.26(b)(8)(i)-(iv); *see*

7   *also* 40 C.F.R. § 122.26(b)(18).The Gulfport MS4 Permit authorizes Gulfport to discharge stormwater to

8   waters of the United States and State in accordance with the approved Stormwater Management

9   Program, effluent limitations, monitoring requirements, and other provisions as set forth in the permit.

10       94.    Under the terms of the Gulfport MS4 Permit, Gulfport is required to effectively prohibit

11  the discharge of non-stormwater into its storm sewer system. *See* Gulfport MS4 Permit, § I.D. Raw or

12  partially treated sewage that is discharged into the Gulfport MS4 is not stormwater.

13       95.    Additionally, Gulfport is required to implement procedures to prevent, contain, and

14  respond to SSOs that may discharge into the Gulfport MS4. *See* Gulfport MS4 Permit, Illicit Discharges

15  and Improper Disposal, § 7(d).

16       96.    Gulfport's MS4 serves the areas also served by the WCS. The Gulfport MS4 contains

17  numerous storm drain inlets that lead to underground storm drain pipes, which discharge to Tampa Bay,

18  the Gulf of Mexico, and other waters of the United States in or adjoining Gulfport. The MS4 owned and

19  operated by Gulfport is a point source under the Clean Water Act. *See* 33 U.S.C. § 1362(14).

20       97.    SSOs that enter Gulfport's MS4 from the WCS and/or from privately-owned lateral lines

21  are discharged to Tampa Bay, the Gulf of Mexico, and other waters of the United States in or adjoining

22  Gulfport.

23       98.    Gulfport has taken inadequate steps to eliminate its violations of the Gulfport MS4

24  Permit and/or the Clean Water Act. Specifically, Gulfport has failed to adequately operate, maintain,

25  repair, replace, and/or update the WCS, thus resulting in SSOs which enter the Gulfport MS4 and

26  discharge to waters of the United States.

27       99.    On information and belief, Plaintiffs allege that many of the SSOs from the WCS which

28  enter the Gulfport MS4 are the result of unaddressed defects in sewer lines such as extensive line

cracking, sags in lines, and misaligned joints; broken sewer lines, pump station equipment failures, and undersized sewer lines or pump station pumping and/or storage capacity.

100.    On information and belief, Plaintiffs allege that SSOs from the WCS which enter the Gulfport MS4 are also caused by dry weather SSOs caused by fats, oil and grease in sewer lines, and blockages caused by roots and debris.

101.    Another major source of Gulfport's SSOs which enter the Gulfport MS4 is wet weather SSOs caused by the WCS's inadequate capacity to handle peak wet weather flows. Flows through the WCS increase considerably during wet weather due to the infiltration and inflow of storm water and groundwater into sewer pipes, thus overwhelming the capacity of the WCS causing SSOs.

102.    SSOs from the WCS which enter the Gulfport MS4 are also caused by the deterioration of sewage infrastructure, under-funding of repairs, and mismanagement.

103.    Gulfport's WCS is deteriorating, and deferral of repairs allows the continued discharge of SSOs to the Gulfport MS4 and waters of the United States in violation of the Gulfport MS4 Permit and the Clean Water Act.

104.    Gulfport's SSO discharges from the WCS into its MS4 in violation of the Gulfport MS4 Permit's discharge prohibitions are ongoing and continuous.

105.    Each SSO discharge in violation of the Gulfport MS4 Permit is a separate and distinct violation of the Clean Water Act.

106.    Gulfport's violations will continue each occasion it discharges SSOs into its MS4 in violation of the requirements of the Gulfport MS4 Permit and the Clean Water Act.

107.    Significantly more SSOs than reported by Gulfport will likely be discovered through this enforcement action. Each such additional SSO that violates the Gulfport MS4 Permit is a separate violation of the Clean Water Act.

108.    By committing the acts and omissions alleged above, Gulfport is subject to an assessment of civil penalties pursuant to Clean Water Act sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d), 1365(a), occurring from at least October 28, 2011 to the present.

109.    An action for declaratory judgment is authorized by 28 U.S.C. § 2201.

110.    An action for injunctive relief under the Clean Water Act is authorized by 33 U.S.C. §

1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the public, for which harm they have no other plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for relief as set forth herein.

## VI.   **RELIEF REQUESTED**

111.   Plaintiffs respectfully request that this Court grant the following relief:

a.      declare Gulfport to have violated and to be in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), for its discharges of SSOs to waters of the United States without a NPDES permit;

b.      declare Gulfport to have violated and to be in violation of the Clean Water Act for discharging pollutants without complying with the substantive and procedural requirements of the Gulfport MS4 Permit;

c.      enjoin Gulfport from discharging SSOs to waters of the United States without a NPDES permit, in violation of section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a);

d.      enjoin Gulfport from violating the substantive and procedural requirements of the Clean Water Act and the Gulfport MS4 Permit;

e.      assess civil penalties against Gulfport of up to $37,500 per day per violation for violations occurring from January 12, 2009, to November 2, 2015 and $51,570 per day per violation for violations occurring after November 2, 2015 and assessed on or after August 1, 2016. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (2016) (Adjustment of Civil Monetary Penalties for Inflation).

f.      award Plaintiffs their reasonable costs of suit, including attorney, witness, and consultant fees, as provided for under by sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d) and 1365(a); and

g.      any such other relief as the Court deems appropriate.

Dated: January 4, 2017

Justin Bloom
Trial Counsel
Florida Bar #89109
Justin Bloom Attorney at Law, PA
P.O. Box 1028
Sarasota, FL 34230
Telephone: (941) 275-2922
Facsimile: (866) 574-2169
Email: bloomesq1@gmail.com

*Attorney for Plaintiffs SUNCOAST
WATERKEEPER, OUR CHILDREN'S
EARTH FOUNDATION, ECOLOGICAL
RIGHTS FOUNDATION*

Table 1

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO Water of the United States (NAME) | REACH STORM DRAIN (Y=1/N=0) |
|---|---|---|---|---|---|---|---|---|---|
| 9/10/2011 | 4074 24th Av. S | wastewater | manhole overflow | other | 12,000 | 12,000 | 0 | Clam Bayou Creek | 0 |
| 6/24/2012 | 4th St. S | raw sewage | manhole overflow | extreme weather | 2,000 | 2,000 | 0 | Tampa Bay | 0 |
| 6/25/2012 | 4936 Sunrise Dr. S | raw sewage | manhole overflow | extreme weather | 700 | 700 | 0 | Tampa Bay | 0 |
| 9/25/2013 | 3800 54th Av. S | partially treated sewage | bypass deep bed filters | extreme weather | 10,462,000 | 0 | 0 | Tampa Bay | 0 |
| 8/3/2015 | 1400 38th St. N. | raw sewage | manhole overflow | extreme weather | 950 | 470 | 0 | Jorgensen Lake Runoff Pond | 0 |
| 8/2/2015 | SW Water Reclamation Facility | raw sewage | other | extreme weather | 450,000 | 15,000,000 | 0 | Clam Bayou | 1 |
| 8/3/2015 | 1400 38th St. N. | raw sewage | manhole overflow | extreme weather | 950 | 0 | 950 | Tampa Bay | 1 |
| 8/5/2015 | 50th Street Street / 31st Avenue | raw sewage | manhole overflow | extreme weather | 186,000 | 186,000 | | Boca Ciega Bay | 0 |
| 8/8/2015 | Albert Whitted Reclamation Facility | treated water | storage tank | extreme weather | 15,000,000 | | | Tampa Bay | 0 |
| 6/7/2016 | Sunset Blvd. & Central Ave | | manhole overflow | extreme weather | 900 | 900 | 0 | intracoastal waterway at Central Av Bridge | 0 |
| 6/7/2016 | 22nd Av @ 60th Way N | raw sewage | manhole overflow | extreme weather | 7,500 | 0 | 7500 | drainage ditch in the middle of location | 1 |
| 6/7/2016 | 691 56th St. N | raw sewage | manhole overflow | extreme weather | 7,500 | 7500 | 7500 | from storm sewer to rentention pond | 1 |
| 8/2/2016 | 53rd Av. N and 10th St. N. | raw sewage | manhole overflow | extreme weather | 25,000 | 0 | 25,000 | Tampa Bay | 1 |
| 8/31/2016 | Albert Whitted Reclamation Facility | partially treated sewage | pump bypass | extreme weather | over 20000000 | over 20000000 | | Tampa Bay | 0 |
| 9/9/2016 | 507 12 Av. S. | raw sewage | manhole overflow | rain | 2,400 | 2,400 | 0 | Booker Creek | 0 |

| DATE OF DISCHARGE VIOLATION | LOCATION OF DISCHARGE | TYPE OF DISCHARGE | SOURCE OF DISCHARGE | CAUSE OF DISCHARGE | Estimated Total Volume of Discharge | Estimated Volume of Discharge to Surface Water | Estimated Volume of Discharge to Storm System | FLOWED TO Water of the United States (NAME) | REACH STORM DRAIN (Y=1/N=0) |
|---|---|---|---|---|---|---|---|---|---|
| 9/1/16 to 9/7/16 | not listed | treated effluent | pump bypass/plant effluent/RWS storage tank/chlorine contct chamber | extreme weather/capacity | 58,000,000 | not provided | not provided | Jungle Lake stormwater pond | 1 |
| 8/31/16 to 9/9/16 | 601 8th Av. SE | partially treated sewage | pump bypass / lift station / stormwater inflow | extreme weather | 93,000,000 | 93,000,000 | na | Tampa Bay | 0 |
| 6/7/2016 | 38th St. S. & 27 Ave. S. | not specified | manhole overflow | extreme weather | 57,750 | 57,750 | 57,750 | Clam Bayou | 1 |
| 6/7/2016 | Beach Dr. & Coffee Pot Blvd. | raw sewage | manhole overflow | rain | 60,000 | 60,000 | 60,000 | Coffee Pot Bayou | 1 |