UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNCOAST WATERKEEPER, ET AL.,

    Plaintiffs,

v.                                                      CASE NO. 8:17-cv-35-T-24 MAP

CITY OF GULFPORT,

    Defendant.
_____/

## ORDER

This cause comes before the Court on two motions: (1) Defendant's Amended Motion to Dismiss (Doc. No. 22), which Plaintiffs oppose (Doc. No. 36); and (2) Defendant's Request for Judicial Notice (Doc. No. 21), which Plaintiffs oppose (Doc. No 37). As explained below, both motions are denied.

**I.**    <u>**Background**</u>

On January 4, 2017, Plaintiffs, Suncoast Waterkeeper ("SCWK"), Our Children's Earth Foundation ("OCEF"), and Ecological Rights Foundation ("ERF"), filed this action against Defendant, the City of Gulfport, Florida, under the citizen-suit enforcement provision of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"). (Doc 1-2 at 1). Plaintiffs allege Defendant has violated the CWA by (1) discharging pollutants into waters of the United States without National Pollution Discharge Elimination System ("NPDES") Permit authorization and (2) violating the terms of its NPDES Permit, No. FLS000005-003, through these discharges. (Doc. 1-2 at 2).

1

SCWK, OCEF, and ERF are non-profit public benefit corporations with members in the Tampa Bay area. (Doc. 1-2 at 2–3). The Complaint states that all three organizations work to protect and/or improve the quality of local waterways "for water contact recreation, aesthetic enjoyment, fishing, wildlife observation, educational study, and spiritual contemplation" and that the organizations' members "use and enjoy the ocean and bay waters and other waters adjoining and in Gulfport for body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation." (Doc. 1-2 at 2–4).

Plaintiffs brought this action on behalf of their members, alleging that, through a series of sanitary sewer overflows ("SSOs") and in violation of the CWA, Defendant "has repeatedly spilled raw and partially treated sewage" from its wastewater collection system into Tampa Bay, the Gulf of Mexico, and other waters near Gulfport. (Doc. 1-2 at 4–6). Plaintiffs further allege that, because wastewater collected within Gulfport is ultimately transported to St. Petersburg's publicly owned treatment works ("POTW") facilities, Defendant has also caused or contributed to SSOs from St. Petersburg's POTW by contributing to the overload on the system during wet weather events in the Tampa Bay area. (Doc. 1-2 at 5, 9). Table 1, attached to the end of the Complaint, documents 19 SSOs Defendant allegedly caused or contributed to. (Doc. 1-2 at 24–25). Based on similar allegations against the City of St. Petersburg, Plaintiffs have filed a similar suit against St. Petersburg. *Suncoast Waterkeeper v. City of St. Petersburg*, No. 8:16-cv-03319-JDW-AEP.

The Complaint in the instant case includes a fairly extensive discussion of Gulfport's wastewater collection systems (Doc. 1-2 at 5–7) and the ways in which Gulfport's alleged SSOs may harm the ecologically sensitive waters of the Tampa Bay area, including risks to fisheries, wildlife habitat, and human health, by loading the waters with pathogens, nutrients, and toxic

chemicals. (Doc. 1-2 at 7–10). Plaintiffs explain the effects of the alleged SSOs on their members as follows:

> Gulfport's illegal discharges of raw and/or partially treated sewage to ocean and bay waters and other waters adjoining and in Gulfport degrade water quality and harm aquatic life in these waters, and thus impairs [sic] Plaintiffs' members' use and enjoyment of the ocean and bay waters and other waters adjoining and in Gulfport.

(Doc 1-2 at 4). As illustrative examples, the Complaint names nine SCWK members and one ERF member who claim to be affected by Gulfport's SSOs and describes how each has had his or her enjoyment of the area's waters impaired. (Doc. 1-2 at 10–13). For example, the Complaint provides the following description of one member of SCWK and his alleged injuries:

> John Rice, current SCWK member who has been a member since before this action was filed, lives in Temple Terrace, Florida. He regularly fishes from a kayak in Simmons Park and Cockroach Bay. On Monday, September 26, 2016, following the massive sewage discharges from St. Petersburg's sewage wastewater collection and transmission system, he observed a smell "like a urinal" and a "film of brown foam" in the shallow waters of Cockroach Bay. Due to the high water level of the bay and river during the St. Petersburg SSOs in November, Mr. Rice believes that the foul smell in Cockroach Bay is likely due to sewage from St. Petersburg's SSOs (which were also contributed to by excessive sewage flows from Gulfport into St. Petersburg's sewage wastewater collection and transmission system) accumulating six inches to a foot above the regular water level in the Cockroach Bay mangroves, which usually do not experience much tidal fluctuation. Mr. Rice and his wife fish or engage in other recreational activities in and around Cockroach Bay from 20 to 25 times per year, and the SSOs from St. Petersburg (including those caused or contributed to by Gulfport) have caused them to lessen the frequency and enjoyment of their fishing and recreation.

(Doc. 1-2 at 10–11). Describing the injuries alleged by ERF member Rachel Rosner, the Complaint provides, in part:

> Both Ms. Rosner and her son enjoy wading and swimming at [Tampa Bay-area] beaches, observing shorebirds and marine life, including sea turtles and manatees; enjoying the view of ocean waters, and the smell of clean saltwater air. She observed the severe

3

> red tide conditions created in the ocean waters adjacent to Sarasota in September and October 2016 in person when she visited beaches in Sarasota. She observed first hand dead fish washed up on the beach and floating in the nearshore waters. . . . These red tide conditions substantially impaired her enjoyment of Sarasota beaches. The dead fish were disturbing to look at and she was upset to view the loss of marine life caused by the red tide conditions. Additionally, the dead fish created a strong stench that made it unpleasant to be by the oceanside. She avoided going to St. Pete Beach or Treasure Island knowing that there were red tide conditions there as well. She has a well-founded fear that these red tide conditions were exacerbated by the series of very large SSOs from St. Petersburg in June, August, and September 2016 (which were caused both by problems in St. Petersburg's sewage collection system and in Gulfport's sewage collection system as well which sends it sewage to St. Petersburg and has old, leaky sewage pipes. These problems with Gulfport's sewage collection system cause Gulfport's flows of sewage to St. Petersburg to spike in a big way during rain storms. This overwhelms St. Petersburg's system leading to SSOs). She is aware that sewage has nutrients that are well-known to be capable of promoting algae blooms that are the cause of red tides. She is further aware that prevailing ocean currents flow from the St. Petersburg area south towards Sarasota and thus risk transporting nutrients from SSOs toward Sarasota. Indeed, she is aware that news accounts have quoted reputable scientists, such as Kelly Redmond of Florida's Fish and Wildlife Research Institute (which monitors toxic algae blooms) as indicating that SSOs have risked making these red tides worse. She is apprehensive that future SSOs from St. Petersburg and Gulfport will continue to add nutrients to local waters and increase the risk of red tides in the future unless comprehensive steps are taken to improve the sewage collection systems of St. Petersburg and Gulfport.

(Doc. 1-2 at 12–13). No individual members of OCEF are named in the Complaint. (Doc. 1-2).

On March 3, 2017, Defendant moved to dismiss this case under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of standing and filed a Request for Judicial Notice of several declarations offered by Plaintiffs in the *St. Petersburg* case. (Doc. 21; Doc. 22). Accordingly, the Court will address both motions.

4

## II. Request for Judicial Notice

Defendant asks this Court to take judicial notice of certain facts and documents, specifically eight sworn declarations filed by Plaintiffs in the *St. Petersburg* Action. The request lists the eight declarations and includes copies of each as attachments. (Doc. 21 at 2, Exhibits A–H). Plaintiffs respond that the *St. Petersburg* declarations are not proper to consider in the instant case because they do not indisputably establish any facts relevant to Plaintiffs' allegations against Gulfport, and they are not central to Plaintiffs' claims in this case. As explained below, the Court agrees with Plaintiffs.

### A. Rule 201(b)

Under Federal Rule of Evidence 201(b), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing F.R.E. 201(b)). Based on this standard, when evaluating documents from other, related court proceedings, "a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Id.* (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir. 1992) (internal quotation marks omitted)). In *Jones*, the Eleventh Circuit determined that it was inappropriate for the district court to take judicial notice of facts in another court's order because the other court's findings were not sufficient to indisputably establish facts that the parties still disputed. *Id.* In making this determination, the court approvingly cited *FDIC v. O'Flahaven*, 857 F. Supp. 154, 157 (D.N.H. 1994), in which the "court could not judicially notice [the] veracity of allegations in affidavits from [a related] state court case; rather it could only take notice that the affidavits were filed and the averments were

5

made." *Id.*; *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (determining that the court could take judicial notice of public documents filed in a securities fraud case "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents," but declining to address whether those statements could be considered if their truth were at issue).

As noted by Defendant, in *Cash Inn of Dade, Inc. v. Metropolitan Dade County*, the Eleventh Circuit held that, in evaluating community members' statements that appeared in minutes from a county commission meeting, "[a] district court may take judicial notice of public records within its files relating to the particular case before it or other related cases." 938 F.2d 1239, 1242–43 (11th Cir. 1991). However, the records at issue in *Cash Inn*—community members' statements contained in minutes from a county commission meeting—had already been introduced into evidence in the same case, and the court was not necessarily relying on them to establish their truth but merely whether the county had a permissible governmental interest, which the documents helped establish by describing the county's motivation for the regulation.

Applying the Eleventh Circuit's general rule to the instant case, the Court can only take judicial notice of the fact that declarations were filed in the *St. Petersburg* case. The Court will not take judicial notice of their contents.

Even if the Court did look to the contents of the *St. Petersburg* declarations, they still would not conclusively establish any facts that would merit dismissal of this case. Defendant has requested judicial notice not of what the *St. Petersburg* declarations *do say* but of what they *do not say*. In effect, Defendant is asking the Court to take judicial notice of its assertion that, if Plaintiffs had any accusations against the City of Gulfport, they would have made those

accusations as part of their declarations given against the City of St. Petersburg. That, however, would require the Court to assume that Plaintiffs are unable to make any factual allegations against Defendant Gulfport merely because Plaintiffs did not make those allegations in declarations that were prepared and submitted in a separate case against a separate defendant. Even if this Court took judicial notice of all of the facts in the *St. Petersburg* declarations— which would be improper since they are not generally known or undisputed—those facts still would not conclusively disprove Plaintiffs' allegations against Gulfport.

### B. Extrinsic Evidence Central to Plaintiffs' Claims

Defendant also argues "that a district court may consider an extrinsic document even on Rule 12(b)(6) review if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010)). Documents deemed central to a plaintiff's claim most often are contracts that establish the basis for the plaintiff's cause of action. *See, e.g., SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (affirming the district court's consideration of terms and conditions contained within certain account-opening documents referenced in the complaint in the same case); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (concluding a dealership contract was central to the plaintiffs' claims where it was "a necessary part of their effort to make out a claim that the relationship between U-Haul and its independent dealers is not a genuine agency, but a sham agency," and the issue was "at the very heart of the appellants' resale price maintenance claim").

Applying this rule, Defendant's argument fails because, even though the *St. Petersburg* declarations' authenticity is not challenged, Defendant has not established that those declarations are central to Plaintiffs' claims in this case. Plaintiffs' allegations against a different defendant in

a different, albeit related, case are not "a necessary part" of their ability to make a claim against Defendant Gulfport nor are they "at the very heart" of their claims against Defendant Gulfport. Although many of the claims made in the *St. Petersburg* declarations overlap with the claims made in the Complaint in the instant case (which makes sense where part of the case against Defendant Gulfport involves its contributions to the SSOs of St. Petersburg's POTW facilities), the individual members of Plaintiffs could provide separate declarations or other evidence in support of their claims against Defendant Gulfport in this case without necessarily having to rely on their declarations from the *St. Petersburg* case at all. This contrasts with the documents in *SFM Holdings* and *Day*, where the contracts were referenced in the plaintiff's complaints and were absolutely necessary for making determinations about the relationships and terms they established, since there was no other source of this information. Furthermore, as previously discussed, even if the contents of the *St. Petersburg* declarations were considered in this case, they would not establish that Defendant has not caused harm to Plaintiffs.

### III.     Motion to Dismiss for Lack of Standing

In its other motion, Defendant moves to dismiss Plaintiffs' complaint for lack of standing. Specifically, Defendant argues: (1) OCEF's claims should be dismissed with prejudice because none of its individual members were named in the Complaint; and (2) SCWK's and ERF's claims should be dismissed with prejudice because they have failed to allege an actual injury that is fairly traceable to Defendant's conduct.[1] Accordingly, the Court will address both arguments.

---

[1] Defendant also argues that Plaintiffs should not be allowed to submit any declarations in this case in order to establish standing, because they previously filed declarations in the *St. Petersburg* case. The Court rejects this argument. Because the Court has denied Defendant's request to take judicial notice of the *St. Petersburg* declarations, Defendant has not submitted any evidence as to Plaintiffs' lack of standing, and as such, Plaintiffs do not need to submit any declarations in response at this time. Without evidence proffered by Defendant, the Court considers Defendant's attack to be a facial attack on Plaintiffs' standing. If Defendant later pursues a factual attack

8

### A. **Standing**

Defendant has challenged Plaintiffs' standing to bring this suit. To satisfy the standing requirements of Article III, a plaintiff must satisfy a three-part test, showing the following:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, (1992)).

In evaluating a motion to dismiss based on lack of standing, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kawa Orthodontics, LLP v. Sec., U.S. Dept. of the Treas.*, 773 F.3d 243, 245 (11th Cir. 2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). In addition, regarding a Rule 12(b)(1) motion to dismiss for lack of standing, the defendant may move under a facial or factual attack on the complaint, and this affects the scope of the Court's review:

> A defendant can move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction by either facial or factual attack. "A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." By contrast, a factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony.

*Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232–33 (11th Cir. 2008) (quoting *McElmurray v. Consol. Gov't of Augusta–Richmond County*, 501 F.3d 1244,

---

on Plaintiffs' standing and submits evidence in support of its attack, the Court will allow Plaintiffs to submit declarations in opposition.

1251 (11th Cir. 2007)) (internal citations omitted). Notwithstanding the foregoing statement in *Kawa Orthodontics*, the Eleventh Circuit elaborated on the differing level of review as follows:

> These two forms of attack [facial versus factual] differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true. . . . But when the attack is factual, "the trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Williamson v. Tucker,* 645 F.2d 404, 412–13 (5th Cir.), *cert. denied,* 454 U.S. 897 (1981)).

Even so, when the defendant's challenge to jurisdiction implicates the merits of the claim, the court should find that jurisdiction exists and review under a summary judgment standard:

> "[T]he proper course of action . . . is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case."
>
> .  .  .
>
> When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction.

*Id.* at 1529, 1530 (quoting *Williamson*, 645 F.2d at 415–16) (citing *Eaton v. Dorchester Development, Inc.*, 692 F.2d 727 (11th Cir. 1982); *Chatham Condominium Ass'n v. Century Village, Inc.*, 597 F.2d 1002, 1011 (5th Cir. 1979)). Under summary judgment review, "[s]ummary judgment may be inappropriate even where the parties agree on the basic facts, but

10

disagree about the factual inferences that should be drawn from these facts . . . . If reasonable minds might differ on the inferences arising from disputed facts, then the court should deny summary judgment." *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Sys. Inc.,* 669 F.2d 1026, 1031 (5th Cir. Unit B 1982) (quoted in *Lawrence*, 919 F.2d at 1530).

In the instant case, Defendant attempts to assert both facial and factual attacks on Plaintiffs' standing. However, the only evidence proffered by Defendant for its factual attack are the *St. Petersburg* declarations, for which Defendant asks this Court to take judicial notice. As stated above, this Court denied Defendant's request to take judicial notice of those declarations, and as a result, the Court considers Defendant's attack on Plaintiffs' standing to be a facial attack only.

### B. OCEF's Standing

Defendant argues that OCEF lacks standing in this case, because it has failed to name any individual affected members within the Complaint. Defendant claims OCEF's failure negates its ability to prove that any of its members would be able to sue in their own right, as required to establish organizational standing. However, Eleventh Circuit precedent indicates that it is not necessary to name an individual member at the pleading stage. Because this challenge is facial, "the court must consider the allegations of the complaint to be true." *Lawrence*, 919 F.2d at 1529.

In addition to the standard elements of standing, organizations suing on behalf of their members must meet three additional requirements to establish standing:

> [A]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose,

11

and neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit.²

*Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) (citing *Laidlaw*, 528 U.S. at 181; *Sierra Club v. Tenn. Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005)). In the Eleventh Circuit, associational plaintiffs are not required to demonstrate anything beyond this, and the organization does not have to name individual plaintiffs on whose behalf the case was brought:

> These [three requirements of associational standing] are the sole requirements. Accordingly, . . . an association may bring suit on behalf of its members or constituents despite the fact that individual members have not actually brought suit themselves. *Nor must the association name the members on whose behalf suit is brought.* As we have stated, "neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites."

*Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (quoting *Church of Scientology v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981) (emphasis added)).³

This Court recognizes that the U.S. Supreme Court has stated that its cases "require[] plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). However, the Court finds OCEF's allegations sufficient at the pleading stage, since it alleges that its members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA. *See Yount v. Salazar*, No. CV11-8171-PCT DGC,

---

² Defendant only challenges OCEF's standing based on the first element—its members' standing to sue in their own right—but the other two elements are also met by OCEF: one of its organizational purposes is to improve and protect the quality of Tampa Bay-area waterways, and this suit does not require participation of any of OCEF's individual members.

³ Although the plaintiffs in *Stincer* ultimately failed to establish standing, it was due to their failures to allege any concrete injury or how a favorable decision would address their injuries—not based on a failure to name individual plaintiffs.

2013 WL 93372, at *6 (D. Ariz. Jan. 8, 2013) (distinguishing *Summers* and—citing *Stincer*—holding that "[t]he fact that [the plaintiff organization] NWMA has not specifically identified these members does not deprive it of standing at the pleading stage"). However, based on *Summers*, OCEF will be required to ultimately prove that at least one of its identified members was injured by Defendant's alleged CWA violations. If Defendant wishes to file another motion to assert a factual attack on OCEF's standing, the Court will allow OCEF to submit affidavits supporting its allegations that at least one of its members has been, is being, and will continue to be adversely affected by Defendant's failure to comply with the CWA.

### C. SCWK and ERF's Standing

Next, Defendant argues that SCWK's and ERF's claims should be dismissed because they have failed to allege an actual injury that is fairly traceable to Defendant's conduct. As explained below, the Court rejects this argument.[4]

Defendant's argument on this issue relies on the contents of declarations offered in the *St. Petersburg* case by individual members of SCWK and ERF. As previously discussed, reliance on alleged facts from declarations in another case is improper, and moreover, Defendant's challenges are intertwined with the merits of whether Defendant discharged pollutants into the waters in and around Gulfport in violation of the CWA, causing degradation to the quality of the

---

[4] Although Defendant did not directly challenge SCWK and ERF's standing based on the element of redressability, the requisite standard has been met. Recognizing that civil penalties generally have a deterrent effect—and that, particularly in CWA cases, penalties may deter violations—the Court has found the element of redressability satisfied by the potential imposition of CWA penalties. *Laidlaw*, 528 U.S. at 185 (citing *Hudson v. United States,* 522 U.S. 93, 102 (1997); *Department of Revenue of Mont. v. Kurth Ranch,* 511 U.S. 767, 778 (1994)). Here, SCWK and ERF are seeking CWA penalties against Defendant and, thus, satisfy the test.

13

waters. Under this review, Defendant's argument must be rejected, because these facts are still disputed.

### 1. **Injury**

The U.S. Supreme Court has held that, in establishing standing, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw,* 528 U.S. at 183 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972); *see also Tenn. Valley Auth.*, 430 F.3d at 1344 (citing *Laidlaw*, 528 U.S. at 183–84) ("In an environmental case, an individual plaintiff may show . . . injury in fact[] by attesting that he uses, or would use more frequently, an area affected by the alleged violations and that his aesthetic or recreational interests in the area have been harmed.").

In this case, Defendant argues that SCWK's and ERF's members' injuries are "based on conjecture and hypotheticals" because—relying on the contents of the declarations from the *St. Petersburg* case rather than the allegations in the Complaint from the instant case—the claims are based on SCWK's and ERF's members fears of future sewage spills and the harm they may cause to Tampa Bay-area waterways. However, SCWK's and ERF's allegations in the Complaint meet the requisite standard of attesting that their members do use, and would more frequently use, their local waterways if not for Defendant's alleged SSOs into those waterways. For example, regarding SCWK member John Rice and his wife, the Complaint provides, "SSOs from St. Petersburg (including those caused or contributed to by Gulfport) have caused them to lessen the frequency and enjoyment of their fishing and recreation." SCWK and ERF further have averred their members' aesthetic and recreational enjoyment has been lessened by Defendant's alleged SSOs into the water. For example, regarding ERF member Rachel Rosner, the Complaint

14

states, "These red tide conditions [which Plaintiffs allege were caused or contributed to by Defendant's SSOs] substantially impaired her enjoyment of Sarasota beaches." SCWK and ERF have sufficiently pled an injury in fact, and at best, Defendant merely disputes these facts.

### 2. Causation

To establish the causation element of standing in CWA cases, plaintiffs must only show that the defendant contributes to the pollution that impairs their ability to use local waters for recreation or aesthetic purposes:

> [A] plaintiff need not prove that their injury can be traced to specific molecules of pollution emitted by the alleged polluter. It is enough that a plaintiff "'show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern."

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir. 2000) (en banc)) (affirming the district court's finding, at the summary judgment stage, that the plaintiffs had CWA standing against the Army Corps of Engineers where the agency had granted a § 404 permit allowing mining operations to discharge dredge or fill material into the river the plaintiffs used for recreational and other purposes). In *Gaston Copper*, the Fourth Circuit further elaborated:

> The "fairly traceable" requirement ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct. But traceability "does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs." If scientific certainty were the standard, then plaintiffs would be required to supply costly, strict proof of causation to meet a threshold jurisdictional requirement— even where, as here, the asserted cause of action does not itself require such proof. Thus, the "fairly traceable" standard is "not equivalent to a requirement of tort causation." Other circuits have refused to interpret it as such.

15

204 F. 3d at 161 (quoting *Natural Resources Defense Council, Inc. v. Watkins,* 954 F.2d 974, 980 n. 7 (4th Cir. 1992)) (citing *Lujan*, 504 U.S. at 560; *Sierra Club v. Cedar Point Oil Co.*, 73 F. 3d 546, 557 (5th Cir. 1996); *Natural Resources Defense Council, Inc. v. Texaco Ref. & Mktg., Inc.,* 2 F. 3d 493, 505 (3d Cir. 1993); *Public Interest Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3d Cir. 1990)).

Defendant, again relying on the statements made by Plaintiffs' members in their declarations from the *St. Petersburg* case, claims that SCWK's and ERF's alleged injuries cannot be traced to Defendant's conduct because none of the members attributed their injuries to Gulfport in those declarations. However, the proper standard requires the Court to look to the allegations made in the Complaint, not to documents submitted in another case, as previously stated. SCWK and ERF have sufficiently pled causation between Defendant's SSOs and SCWK's and ERF's members' impaired enjoyment of local waterbodies.  SCWK and ERF have alleged that Defendant itself has discharged sewage into waterways used by their individual members and that Defendant has contributed to SSOs in St. Petersburg because Defendant shares its POTW systems. Through both of these allegations, SCWK and ERF have claimed that Defendant has discharged the type of pollutant that causes or contributes to their reduced enjoyment of the waters near and in Gulfport.  Thus, SCWK and ERF have sufficiently pled causation, and at best, Defendant merely disputes these facts.

## IV.     Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant's Amended Motion to Dismiss (Doc. No. 22) is **DENIED**.

(2) Defendant's Request for Judicial Notice (Doc. No. 21) is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 1st day of May, 2017.

_____
SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record